**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

_____

BOBBY GRUBBS,

                        Plaintiff,

            v.                            No. 14-CV-467
                                                 (GLS/CFH)

JOHN SERRELL, Correction Officer,
Great Meadow Correctional Facility;
et al.,

                      Defendants.

_____

**CHRISTIAN F. HUMMEL
U.S. MAGISTRATE JUDGE**

**APPEARANCES:**                          **OF COUNSEL:**

Bobby Grubbs
Plaintiff Pro Se
Clinton Correctional Facility
P.O. Box 2001
Dannemora, New York 12929

HON. ERIC T. SCHNEIDERMAN         MARIA LISI-MURRAY, ESQ.
Attorney General for the                Assistant Attorney General
   State of New York
The Capitol
Albany, New York 12224-0341
Attorney for Defendants

### REPORT-RECOMMENDATION AND ORDER[1]

      Plaintiff pro se Bobby Grubbs, an inmate who was, at all relevant times, in the

custody of the New York State Department of Corrections and Community Supervision

("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, fifteen

---

     [1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DOCCS employees, violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. At all relevant times, Grubbs was incarcerated at Great Meadow Correctional Facility ("Great Meadow"). Grubbs commenced this action on April 24, 2014. Dkt. No. 1. On August 25, 2014, Grubbs filed an amended complaint as of right pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 15(a). Am Compl. (Dkt. No. 11). Following initial review of the complaint pursuant to 28 U.S.C. § 1915A, the remaining claims are: (1) defendant Correction Officer ("C.O.") John Serrell, used excessive force on Grubbs on February 1, 2012; (2) defendant C.O. Marcie Everleth, failed to protect Grubbs during the February 1, 2012 excessive force incident; (3) defendants Registered Nurse ("R.N.") Kimberly Lipka, Dr. David Karandy, M.D., and R.N. David Lehmann were deliberately indifferent to Grubbs' serious medical need following the February 1, 2012 excessive force incident; (4) defendants C.O. Joseph Harrington, and C.O. Eugene Raimo used excessive force on Grubbs during a cell move on January 22, 2013; (5) defendant Sergeant Toby Williams placed Grubbs on keeplock for three days in retaliation for Grubbs' filing a grievance against him; (6) defendant C.O. Robert McCauley denied Grubbs access to legal supplies and other services in January 2013; (7) defendants Serrell, C.O. Lee Lawton, C.O. Brian Hood, and Mailroom Supervisor Sara Nakiewicz prevented Grubbs from mailing a notice of claim to the New York Court of Claims and the New York Attorney General's Office; and (8) defendant Superintendent Steven Racette failed to properly supervise staff or protect Grubbs from staff misconduct. See Dkt. No. 18.

Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. Dkt. No. 54. Plaintiff opposed the motion. Dkt. No. 66. Defendants filed a reply. Dkt. No. 68. For the following reasons, it is recommended that defendants motion be

granted in part and denied in part.

# I. Background

The facts are reviewed in the light most favorable to Grubbs as the non-moving part. See subsection II.A infra.

## A. Grubbs' Recitation of Facts

### 1. February 1, 2012 Incident and Subsequent Medical Care

On February 1, 2012, at approximately 7:40 p.m., Grubbs was standing by the wall of Great Meadow's rotunda, awaiting escort to the clinic. Am. Compl. at 3. When the procession of inmates began walking toward the clinic, defendant Serrell pulled Grubbs out of the line. Id. Once Grubbs was out of the line, he encountered defendant Everleth, who instructed Grubbs to go where he is "supposed to be." Id.

Once the procession of inmates was out of sight, Serrell repeatedly poked Grubbs in the chest, saying "who do you think you are?" Am. Compl. at 4. Grubbs asked Serrell to stop touching him, and Serrell responded by saying "I can do whatever I want to do, just like you can do whatever you want to do." Id. Grubbs responded by saying "that's what I plan to do." Id. Serrell then pushed Grubbs into the wall, and Grubbs assumed the "pat frisk" position. Id. Serrell "violently" kicked Grubbs' legs open, even though they were already spread. Id. Everleth then pulled Grubbs' right hand and arm behind his back, and Serrell handcuffed him. Id. at 4-5. Serrell then threw Grubbs to the ground and punched him repeatedly in his stomach and torso. Id. at 5. Everleth watched the assault but did not

-3-

intervene.  Id.  After approximately five minutes, the commissary officer pulled Serrell off of Grubbs.  Id.

Immediately following the assault, Grubbs was examined by defendant Lehman. Am. Compl. at 5.  Grubbs suffered a black and bloodshot eye, and multiple lumps, including on his left forehead and scalp area, although he states that these injuries were not fully visible until the evening after the assault.  Id. at 6.  Beginning on February 2, 2012, the day after the assault, Grubbs sent multiple sick call requests asking to receive an MRI, and an examination by a doctor.  Id.  He also sent multiple letters to defendant Dr. Karandy.  Id.  Dr. Karandy ignored the letters.  Id.

Although defendant Lipka made a notation in Grubbs' medical file indicating that he was examined on February 3, 2012, Grubbs states that he did not receive any medical care on that date.  Am. Compl. at 6.  He states that he received Tylenol while on "administrative hold" or keeplock.  Id.  While Lehmann was delivering Grubbs' evening medication, Grubbs attempted to show him his contusions and swelling, but Lehmann ignored them.  Id. at 6-7.

On February 15, 2012, Dr. Karandy examined Grubbs.  Am. Compl. at 9.  Grubbs states that, although Dr. Karandy wrote in his medical file that Grubbs's issues were resolved, he was still suffering from headaches, dizziness, and other ailments.  Id.  At this examination, Grubbs showed Dr. Karandy scarring on his body, and complained of jaw and temple pain on the right side of his face.  Id.  Dr. Karandy did not have Grubbs' medical file in the exam room during this visit, nor did he take Grubbs' "vitals."  Id.  Dr. Karandy sent Grubbs for an x-ray, and also sent him for an MRI in August 2012.  Id.

While Grubbs was confined to the Special Housing Unit ("SHU") from February 7, 2012 until February 14, 2012, Lipka denied his requests for "over the counter strength

medications." Am. Compl. at 11.  Lipka "downplayed" Grubbs' injuries when noting them in

his medical file, and Grubbs believes that Lipka deliberately destroyed his sick call requests.

Id. at 12.


## 2.  Issues with Mailing Legal Papers, April-May 2012

While confined to the SHU, Grubbs attempted to mail a notice of intention, but could

not get an officer to notarize his signature, despite multiple requests.  Am. Compl. at 12.

Grubbs eventually obtained a notary's signature and sent his papers to the Attorney

General on April 25, 2012.  Id. at 13.  Grubbs attached a note to the papers alerting  the

Great Meadow mailroom of the approaching deadline for him to file the notice of intent.  Id.

However, Grubbs incorrectly addressed the disbursement form, which collects postage

fees, causing the papers to be returned to Grubbs through mail distribution on April 27,

2012.  Id.  As a result, the Attorney General's Office received the notice of intention on May

4, 2012, past the ninety-day accrual deadline.  Id.


## 3.  January 22, 2013 Incident

On January 22, 2013, Grubbs was told to pack his belongings in preparation for his

move from C6 Company to B5 Company.  Am. Compl. at 14.  Grubbs became upset at the

prospect of moving to B5 Company and suffered a panic attack.  Id. at 15.  He felt weak and

suffered chest pains and vision issues.  Id.  While Grubbs was hyperventilating, defendant

Raimo told him that if he did not pack his belongings, Raimo would do so for him.  Id.

Raimo then left and defendant Harrington appeared.  Id.  Grubbs told Harrington that he

needed medical treatment.  Id.  Defendant Williams then appeared, and Grubbs asked for medical treatment again.  Id.  Williams instructed Grubbs to stand by the catwalk gate while Raimo and Harrington packed his belongings.  Id.  Grubbs then blacked out, and came to while being dragged down the stairs.  Id. at 15-16.  Raimo and Harrington then threw him on top of the inmate clerk's desk.  Id. at 16.

Following the incident, Grubbs was taken for medical treatment on a stretcher.  Am. Compl. at 16.  Grubbs cried during the transport to the MHC.  Id.  During the transport, Williams threatened Grubbs, and told him not to say anything about the incident.  Id.  Grubbs was examined by Dr. McCloskey at the MHC and released to normal activities.  Id.  Williams observed the examination.  Id.


### 4. Denial of Access to Legal Services and Supplies, Mail Tampering, and Retaliatory Keeplock - January 2013

On January 24, 2013, Grubbs visited the Great Meadow law library.  Am. Compl. at 18.  He asked defendant McCauley if he could use the photocopier.  Id.  Grubbs was entitled to "special access" to the photocopier because of an impending deadline.  Id.  McCauley informed Grubbs that the photocopier was broken.  Id.  Grubbs told McCauley that his filing deadline was February 1, 2013.  Id.  McCauley told Grubbs that, if the photocopier was not functional by January 28, 2013, he would allow Grubbs to use a different photocopier "upstairs in the school's office."  Id.  When Grubbs expressed concern that he still would not meet his deadline, McCauley stated that he would be sure that the papers go out as legal mail.  Id.

On January 28, 2013, Grubbs went to the Great Meadow law library during his

approved time.  Am. Compl. at 19.  He presented McCauley with an "approved advance" that had been signed by the "Acting Dep. Spt. of Programs," Ms. Tynon, in order for Grubbs to obtain a hall pass to use the school office photocopier.  Id.  McCauley told Grubbs that he would need verbal confirmation from Ms. Tynon before he could allow Grubbs to use the school office photocopier.  Id.

While Grubbs was waiting for McCauley to receive verbal confirmation from Ms. Tynon for him to use the school office photocopier, Williams called McCauley and asked him to send Grubbs to his office for an interview.  Am. Compl. at 19.  When Grubbs arrived to Williams' office, Williams asked him to sign a grievance regarding the destruction of his property during the January 22, 2013 cell move.  Id. at 20.  Grubbs refused to sign.  Id.  Williams then told Grubbs that he couldn't "wait to see the look on [Grubbs'] face when [he] get[s] sent back to [his] enemies[.]"  Id.  Grubbs was subsequently "keeplocked" for three days.  Id.  Because he never gained access to a photocopier, he mailed the original copies of his legal papers for filing.  Id. at 20-21.  Grubbs maintains that Williams "keeplocked" him in retaliation for his filing a grievance.  Id. at 21.

On the morning of January 29, 2013, Grubbs stood at his cell gate to hand the company officer his motion addressed to the New York Court of Claims, along with a letter addressed to the mailroom alerting them of his February 1, 2013 deadline.  Am. Compl. at 21.  The note stated that Grubbs had "a valid advance for special postage on file at the law library and with Ms. Tynon[.]"  Id.  All of the gates in Grubbs' company opened for breakfast, except for his.  Id.  When Serrell and another unidentified officer walked by his cell, Grubbs gave the unidentified officer his mail, and asked the officer to sign it.  Id. at 21-22.  Through a Freedom of Information Law request, Grubbs later identified defendants Hood and Lawton

as the officers responsible for collecting mail and signing disbursements for Grubbs' company on the morning of January 29, 2013.  <u>Id.</u> at 22.  Grubbs received a letter from the New York Court of Claims, dated April 9, 2013, stating that he did not have any motions or claims pending in the Court of Claims.  <u>Id.</u> at 23.  The Great Meadow mailroom responded to Grubbs' complaints about the handling of his mail by stating that he had never signed the disbursement form.  <u>Id.</u>  Staff at the Great Meadow mailroom stated that they never received mail from Grubbs to be sent to the Court of Claims.  <u>Id.</u>

On the morning of January 30, 2013, Grubbs handed his outgoing legal mail, a motion addressed to the New York Attorney General's Office, to Serrell and asked him to sign a disbursement form.  Am. Compl. at 22-23.  Grubbs later learned that the New York Attorney General's Office received the motion on February 11, 2013.  <u>Id.</u> at 23.  The Great Meadow mailroom responded to Grubbs' complaints about the handling of his mail by stating that he had never signed the disbursement form.  <u>Id.</u>

## II.  Discussion

### A.  Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it is supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law.  F<small>ED</small>. R. C<small>IV</small>. P. 56(a), (c).  The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion.  F<small>ED</small>. R. C<small>IV</small>. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Facts are material if they may

affect the outcome of the case as determined by substantive law.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable

inferences drawn in favor of the non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d

Cir. 1997).

 The party opposing the motion must set forth facts showing that there is a genuine

issue for trial, and must do more than show that there is some doubt or speculation as to

the true nature of the facts.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475

U.S. 574, 586 (1986).  For a court to grant a motion for summary judgment, it must be

apparent that no rational finder of fact could find in favor of the non-moving party.  Gallo v.

Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994).

 Where, as here, a party seeks judgment against a pro se litigant, a court must afford

the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471,

477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se
> litigant is entitled to "special solicitude," . . . that a pro se
> litigant's submissions must be construed "liberally,". . . and
> that such submissions must be read to raise the strongest
> arguments that they "suggest," . . . . At the same time, our
> cases have also indicated that we cannot read into pro se
> submissions claims that are not "consistent" with the pro se
> litigant's allegations, . . . or arguments that the submissions
> themselves do not "suggest," . . . that we should not "excuse
> frivolous or vexatious filings by pro se litigants," . . . and that
> pro se status "does not exempt a party from compliance with
> relevant rules of procedural and substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d

185, 191-92 (2d Cir. 2008).

**B. Eighth Amendment**

**1. Deliberate Indifference to a Serious Medical Need**

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 828 (1994) (quoting Helling v. McKinney, 509 U.S. 25 (1993)); Wilson v. Seiter, 501 U.S. 294 (1991); Estelle v. Gamble, 429 U.S. 97 (1976)). The Eighth Amendment obligates prison officials to provide necessary medical care to prisoners. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). To state a cognizable claim against prison officials for deliberate indifference to a substantial risk of serious injury, a prisoner must first show the presence of a "serious illness or injury." Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk of harm and failing to take measures to avoid the harm. Farmer, 511 U.S. at 834.

A serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Bock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of

and disregarded the prisoner's serious medical needs." <u>Chance</u>, 143 F.3d at 702. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." <u>Farmer</u>, 511 U.S. at 837. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." <u>Gamble</u>, 429 U.S. at 104. "[M]ere disagreement over the proper treatment does not create a constitutional claim" as long as the treatment was adequate. <u>Chance</u>, 143 F.3d at 703. Therefore, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . . are not adequate grounds for a Section 1983 claim." <u>Sonds v. St. Barnabas Hosp. Corr. Health Servs.</u>, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

### a. Serious Medical Need

Grubbs claims that, as a result of the excessive force incident on February 1, 2012, he suffered cluster headaches, an abrasion on his upper left arm, a lump on his forehead, paranoia, anxiety, nausea, and permanent damage to his right eye, including a ruptured vitreous. Am. Compl. at 6, 29. Defendants contend that Grubbs has failed to show that his injuries amounted to a serious medical need. Dkt. No. 54-1 at 5-7.

Grubbs has failed to demonstrate that the injuries he suffered following the use of force incident on February 1, 2012 were sufficiently serious to rise to the level of a serious medical need. He states that, following the use of force incident, he suffered a black and bloodshot eye, multiple lumps on his left forehead and scalp, and other contusions and

swelling.  Am. Compl. at 6.  Grubbs also states that he has "permanent" damage to his right

eye, and a "permanent lump" at his hairline.  Id. at 29.  The type of injuries that Grubbs

complains of, namely bruises, cuts, and pain following a use of force incident, are not

sufficiently serious to trigger an Eighth Amendment violation.  See Rodriguez v. Mercado,

No. 00 CIV. 8588 JSRFM, 2002 WL 1997885, at *8 (S.D.N.Y. Aug. 28, 2002) (finding that

the plaintiff's bruises to his head, back, and wrists sustained during a use of force incident

were insufficient to demonstrate a serious medical need).

Grubbs has produced no evidence to show that his injuries required immediate

attention, but he received immediate attention nonetheless.  Grubbs was examined by

defendant Lehmann immediately after the use of force, and Lehmann observed only a small

abrasion on Grubbs' left upper arm.  Declaration of David Lehmann ("Lehmann Decl.") (Dkt.

No. 55-1) ¶ 6; Lehmann Decl. Exh. B (Dkt. No. 55-1) at 13.  Lehmann did not observe any

injuries to Grubbs' head.  Id.  Approximately two months after the incident, Dr. Karandy did

not report any physical findings while examining Grubbs for right-sided mandibular pain and

headaches.  Declaration of Dr. David Karandy ("Karandy Decl.") (Dkt. No. 55-2) ¶ 14.

Further, an MRI of Grubbs' head and brain conducted on July 17, 2012 yielded normal

findings.  Id. ¶ 20.  Although Grubbs argues that a lump on his forehead is visible in pictures

taken after the use of force incident, (Dkt. No. 66-2 at 9-10; Declaration of Maria Lisi-Murray

("Lisi-Murray Decl.") Exhibit C (Dkt. No. 54-5)), the existence of a forehead lump does not

create a sufficiently serious medical ailment to trigger a constitutional violation.  See

Povoski v. Artus, No. 9:11-cv-120 (DNH/DEP), 2014 WL 1292219, at *19 (N.D.N.Y. Mar. 28,

2014) (finding that the plaintiff's scrapes and bruises suffered during a use of force incident

were insufficient to establish a serious medical need); Dalio v. Hebert, 678 F. Supp. 2d 35

-12-

(N.D.N.Y. 2009) (finding that the plaintiff's version of his injuries, including two black eyes and open lacerations, was insufficient to establish a serious medical need).

Additionally, two weeks after the use of force incident, Grubbs states that he suffered from "nausea, headaches, dizzyness [sic] and other ailments." Id. at 9. These ailments also do not rise to the level of a serious medical need. See Qader v. New York, 396 F. Supp. 2d 466, 470 (S.D.N.Y. 2005) (holding that the plaintiff's dizziness and "terrible headache" were not serious medical needs); Davidson v. Scully, 155 F. Supp. 2d 77, 89 (S.D.N.Y. 2001) (finding that blurry vision and headaches do not produce degeneration or extreme pain, and therefore are not serious medical needs). Further, despite Grubbs' claims that the headaches persisted and that he suffered a permanent deformity on his head, Dr. Karandy's April 16, 2012 examination of Grubbs' head did not yield any physical findings. Karandy Decl. ¶ 14. A CT scan performed on Grubbs' head on July 17, 2012 was normal. Id. ¶ 20. Thus, Grubbs has failed to establish that any of the ailments he suffered following the use of force incident on February 1, 2012 constitute a serious medical need.

### b. Deliberate Indifference

### i. Nurse Lehmann

Grubbs alleges that Lehmann failed to provide medical care following the use of force incident on February 1, 2012. Am. Compl. at 6. He further alleges that Lehmann failed to provide medical care on February 2, 2012, while delivering medication to his cell. Id. at 6-7.

To meet the deliberate indifference prong of his Eighth Amendment claim, Grubbs

must show that Lehmann "knew of and disregarded [his] serious medical needs." Chance, 143 F.3d at 702. Here, Lehmann states that he examined Grubbs following the use of force incident on February 1, 2012, and observed only a small abrasion on Grubbs' arm. Lehmann Decl. ¶ 6. The contemporaneous injury report, taken approximately thirty minutes after the use of force incident, notes Lehmann's findings, and also notes that Lehmann did not observe any injuries to Grubbs' head. Id.; Lehmann Decl. Exhibit B at 13. When Lehmann next saw Grubbs, on February 2, 2012, he delivered medication to Grubbs' cell due to Grubbs' keeplock status. Lehmann Decl. ¶ 10. This visit, called "[m]edication rounds" is strictly for "delivering and dispensing medications." Id. ¶ 9. Absent an emergency situation, inmates who complain of an ailment during medication rounds are advised to submit a Sick Call Request to be examined by medical staff the following day. Id. Lehmann states that, while delivering Grubbs' medication, he observed that Grubbs was agitated, but also alert, coherent, and exhibiting clear speech. Id. ¶ 11. Lehmann further stated that if Grubbs had complained to him about his injuries, he would have advised him to put in a Sick Call Request. Id. Grubbs did submit a Sick Call Request, and was examined by defendant Lipka the next day. Id. ¶ 12.

Grubbs has failed to show that Lehmann acted with deliberate indifference. Lehmann provided Grubbs with prompt care thirty minutes after the use of force incident on February 1, 2012, as evidenced by Lehmann's declaration, and Grubbs' Ambulatory Health Record ("AHR"). Lehmann states Grubbs suffered only a small abrasion on his arm, and no head injuries. Lehmann Decl. ¶ 7. Grubbs received analgesics for treatment of a headache. Id. Further, pictures taken during Lehmann's examination of Grubbs show no visible injuries, although Grubbs argues that a lump on his forehead can be discerned from

the pictures.  Dkt. No. 66-2 at 9-10; Lisi-Murray Decl. Exh. C.  However, even if Grubbs suffered a lump on his head, he provides the Court with no evidence that he should have received any treatment other than the analgesics that Lehmann provided.  See Robinson v. Viscuso, No. 10-CV-326, 2013 WL 5470013, at *11 (W.D.N.Y. Sept. 30, 2013) (dismissing deliberate indifference claim where the plaintiff failed to show that the medical care he received following a use of force incident was inadequate).  Grubbs' claim that the treatment he received from Lehmann the following day was inadequate also fails for the same reason.  Aside from Lehmann's explanation that prison protocol dictates that medication rounds are strictly for delivering and dispensing medication, Grubbs has failed to articulate what treatment he expected to receive from Lehmann.  See Am. Compl. at 6.  Lehmann provided Grubbs with Tylenol, (Am. Compl. at 6; Lehmann Decl. ¶ 10), and Grubbs was examined for complaints of bumps on his head the next day by Lipka.  Lehmann Decl. ¶ 11.  Thus, Grubbs has failed to raise a triable issue of fact as to Lehmann's deliberate indifference.  See Farray v. Green, No. 12-CV-4717 (ARR)(LB), 2013 WL 5676315, at *4 (E.D.N.Y. Oct. 16, 2013) (finding no deliberate indifference where the plaintiff claimed that he was ignored, but did not make a claim that the medical care he received was inadequate).

Accordingly, it is recommended that defendants' motion as to Grubbs' deliberate indifference claim against Lehmann be granted.

### ii.  Dr. Karandy

Grubbs alleges that Dr. Karandy "lied" by writing in his medical file that, on February 15, 2012, Grubbs issues were resolved.  Am. Compl. at 9.  Grubbs further alleges that Dr. Karandy did not treat the many ailments that Grubbs complained of at the February 15,

2012 visit, including nausea, headaches, dizziness, and "the runs." Id. at 9-10. Dr. Karandy alleges that he provided Grubbs with adequate and appropriate medical care. See Karandy Decl. ¶ 28.

Dr. Karandy states that he examined Grubbs on February 15, 2012. Karandy Decl. ¶ 12. During that examination, Dr. Karandy observed a superficial abrasion on Grubbs' left arm. Id. Grubbs indicated to Dr. Karandy that his other injuries had resolved. Id. Contemporaneous records from Grubbs' AHR also indicate that Grubbs' issues were resolved, other than the abrasion on his left arm. Karandy Decl. Exh. A (Dkt. No. 55-2) at 8. Dr. Karandy examined Grubbs on April 16, 2012, where Grubbs complained of mandibular pain and headaches. Karandy Decl. ¶ 14. A physical examination was normal, and Dr. Karandy ordered mandibular x-rays. Id. The x-rays were normal. Id. Due to Grubbs' complaints of headaches, history of HIV, and reports of head trauma, Dr. Karandy also ordered an MRI to be performed on Grubbs' head and brain. Id. ¶¶ 15-16. On June 21, 2012, Grubbs "declined the MRI due to intolerance of the contrast." Id. ¶ 17. On July 17, 2012, Dr. Karandy ordered a CT scan of the head for Grubbs, due to his complaints of headaches in conjunction with his HIV positive status. Id. ¶ 18. The CT scan results were normal. Id. ¶ 20.

The record shows that Dr. Karandy provided Grubbs with consistent medical care and diligently responded to Grubbs' complaints. The crux of Grubbs argument appears to be that he continued to experience headaches and other symptoms despite treatment from Dr. Karandy. See Am. Compl. at 9-10. It is well-established that "mere disagreement over the proper treatment does not create a constitutional claim." Chance, 143 F.3d at 703. Further, although Dr. Karandy's treatments and diagnostic techniques have apparently not

given Grubbs the relief he desires, Grubbs has failed to allege how the treatments were inadequate. It appears from the record that Grubbs received adequate medical care, and unfortunately his symptoms persisted. See Koehl v. Bernstein, No. 10 Civ. 3808(SHS)(GWG), 2011 WL 2436817, at *23 (S.D.N.Y. June 17, 2011) (finding no triable issue of fact as to a doctor's deliberate indifference where the plaintiff's lung disease did not respond to treatments). Thus, Dr. Karandy's treatment of Grubbs does not rise to deliberate indifference.

Accordingly, it is recommended that defendants' motion on Grubbs' deliberate indifference claim against Dr. Karandy be granted.

### iii. Nurse Lipka

Grubbs alleges that Lipka fabricated a notation in his AHR that she visited him for a Sick Call Request on February 3, 2012. Am. Compl. at 6. Grubbs alleges that Lipka did not visit him. Id. Grubbs further alleges that Lipka "consistently harassed" him during his SHU confinement, and "gave [him] a hard time" about his requests for medications. Id. at 11. He alleges that Lipka "downplayed" her observations of Grubbs' injuries so that he would not receive treatment. Id. at 12.

Lipka states that, on February 3, 2012, she responded to Grubbs' Sick Call Request and observed him as "coherent and laughing" with "no visible lumps." Declaration of Kimberly Lipka ("Lipka Decl.") (Dkt. No. 55) ¶ 7; Lipka Decl. Exhibit A (Dkt. No. 55) at 5. Lipka gave Grubbs four packs of non-aspirin pain reliever to treat his headaches. Lipka Decl. ¶ 7. Lipka examined Grubbs at other times during his incarceration at Great Meadow for ailments unrelated to the February 1, 2012 use of force incident. See id. ¶¶ 8-11. Lipka

further states that she never falsified Grubbs' medical records.  Id. ¶ 13.[2]

Firstly, the Court notes that verbal harassment, unaccompanied by any injury, is not actionable under section 1983.  See Aziz Zarif Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) ("[V]erbal threats without injuries are not actionable under § 1983.").

Next, the record shows that Lipka provided Grubbs with adequate treatment for his headache complaints.  See Lipka Decl. ¶ 7.  She examined him only once in connection with the February 1, 2012 use of force incident and, after failing to observe any visible lumps, gave Grubbs a pain reliever to treat his headache.  Id.  Grubbs fails to allege any triable issue of fact as to Lipka's alleged deliberate indifference.  See Ruiz v. Homerighouse, No. 01-CV-0266E(SR), 2003 WL 21382896, at *3 (W.D.N.Y. Feb. 13, 2003) (finding no deliberate indifference where the plaintiff asserted unsubstantiated claims of his injuries).

Accordingly, it is recommended that defendants' motion as to Grubbs' deliberate indifference claim against Lipka be granted.


## 2.  Excessive Force

The objective element of an excessive force claim is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection."  Hudson, 503 U.S. at 9 (internal citations omitted); Blyden, 186 F.3d at 262.  However, "the malicious use of force to cause harm

---

[2] To the extent that Grubbs attempts to make a constitutional claim based on Lipka's alleged falsification of his medical records, the Court notes that such a claim is not a constitutional violation.  See Shepherd v. Fischer, No. 9:10-CV-1524 (TJM/DEP), 2015 WL 1246049, at *18 n.26 (N.D.N.Y. Feb. 23, 2015) (noting that a claim for falsification of medical records is not a constitutional claim).

-18-

constitute[s] [an] Eighth Amendment violation per se" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9–10 (citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" Sims, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims, 230 F.3d at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Id. (quoting Hudson, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] . . . the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

### a. February 1, 2012 Incident

Grubbs alleges that defendant Serrell used excessive force against him on February 1, 2012. Am. Compl. at 3-5. Defendants argue that the alleged use of force was de

-19-

minimus in nature, and therefore did not rise to the level of a constitutional violation.  Dkt. No. 54-1 at 12-14.  Defendants also argue that Grubbs has failed to present a genuine issue of material fact as to defendants Serrell and Everleth's culpability.  Id. at 15-16.

Grubbs account of the events of February 1, 2012 diverges in some instances with Serrell and Everleth's accounts.  Grubbs contends that Serrell pulled him out of a line of inmates, waited for the line of inmates to proceed out of sight, and shoved Grubbs against a wall, "violently" kicking his legs apart.  Am. Compl. at 3-4.  Everleth then pulled Grubbs' right hand and arm behind his back, allowing Serrell to handcuff him.  Id. at 4-5.  Serrell then threw Grubbs to the ground and "viciously" beat him.  Id. at 5.  Serrell states that, on the night of February 1, 2012, he observed Grubbs receive an item from another inmate, and place the item in his right front pocket.  Declaration of John Serrell ("Serrell Decl.") (Dkt. No. 54-6) ¶ 5.  Serrell then ordered Grubbs to submit to a pat frisk.  Id. ¶ 6.  During the pat frisk, Grubbs said to Serrell: "if you touch me I'm going to touch you," then abruptly removed his hands from the wall and attempted to strike Serrell with his right elbow.  Id. ¶¶ 6-7.  Serrell then grabbed Grubbs around the torso using both of his arms and forced him, face down, onto the floor.  Id. ¶ 8.  He then grabbed both of Grubbs' wrists and forced them behind him, onto Grubbs' lower back, and Everleth placed mechanical restraints on Grubbs' wrists.  Id. ¶¶ 9-11.  Once the mechanical restraints were applied, Grubbs became compliant with the officers' orders.  Id. ¶12.

As to the objective element of Grubbs' claim, if Grubbs' allegations are true, then Serrell's application of force was certainly more than de minimus.  A gratuitous assault, even without significant injuries, constitutes more than a de minimus use of force.  See Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) (denying summary judgment where the

plaintiff alleged assault, even though the plaintiff's only injuries were a bruised shin and swelling over his left knee); Dallio v. Santamore, No. 9:06-CV-1154 (GTS/DRH), 2010 WL 125774, at *9 (N.D.N.Y. Jan. 7, 2010) (denying summary judgment motion where the plaintiff alleged that he was assaulted after being handcuffed, even though the plaintiff had no significant injuries). Although defendants also rely on documented medical evidence to show that Grubbs' injuries indicate that the use of force was de minimus, the medical evidence shows that Grubbs suffered some injury from the assault. See Lehmann Decl. Exh. B (Use of Force Report noting abrasion on Grubbs' left arm). "[T]he absence of 'some arbitrary quantity of injury'" does not indicate that Grubbs' claim is not meritorious. Wilkins v. Gaddy, 559 U.S. 34, 39 (2010) (quoting Hudson, 503 U.S. at 9). Furthermore, Grubbs points to pictures of himself taken immediately following the altercation that show what appears to be lump on his forehead. Dkt. No. 10; Lisi-Murray Decl. Exh. C at 4 (Dkt. No.54-5). Because of the conflicting accounts of the use of force used, the Court determines that Grubbs' has presented a genuine issue of material fact as to the objective element of this excessive force claim.

As to the subjective element of Grubbs' claim, Grubbs claims that, after Serrell and Everleth handcuffed him, Serrell threw him to the ground and punched his stomach and torso. Am. Compl. at 4-5. Serrell disputes this account by claiming that he forced Grubbs to the ground only after Grubbs attempted to assault him during a pat frisk. Serrell Decl. ¶¶ 6-11. If a finder of fact were to credit Grubbs' version of events, then they could reasonably infer that Serrell acted maliciously and wantonly. See Dallio, 2010 WL 125774, at *9 (finding the plaintiff's allegations that he was assaulted while in mechanical restraints sufficient to raise a triable issue of fact as to the subjective element of the plaintiff's

excessive force claim); <u>Allen v. City of New York</u>, 480 F. Supp. 2d 689, 707-08 (S.D.N.Y. 2007) (denying summary judgment where the plaintiff's and the defendant's versions of events differed as to whether the plaintiff was assaulted for no legitimate reason).  The Court also notes that an explanation of whether Serrell actually searched for the object he observed Grubbs receiving is noticeably absent from Serrell's declaration, raising some question as to his motivation for stopping Grubbs.  Thus, Grubbs has raised a triable issue of fact as to the subjective element of his excessive force claim.

Accordingly, the Court recommends that defendants' motion as Grubbs' excessive force claim against Serrell regarding the February 1, 2012 incident be denied.


### i. Everleth

Grubbs claims that Everleth failed to intervene to protect him from Serrell's assault. Am. Compl. at 4-5.  Everleth claims that she observed Serrell using force on Grubbs, but that the amount of force used was necessary and reasonable to control Grubbs. Declaration of Marcie Everleth ("Everleth Decl.") ¶¶ 5-7.

To establish a claim of failure to intervene, a plaintiff must show "that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." <u>Henry v. Dinelle</u>, No. 9:10-CV-0456 (GTS/DEP), 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (citation omitted).

As explained in section II.B.2.a, <u>supra</u>, Grubbs has raised a genuine issue of material fact as to whether Serrell used excessive force on him on February 1, 2012.  Grubbs claims that Everleth was present for the entirety of the incident, including during the time that

Serrell was assaulting Grubbs. See Am. Compl. at 3-5. Everleth confirms that she witnessed the excessive force incident. Everleth Decl. ¶ 5. If the version of events according to Grubbs is true, then a reasonable person in the officer's position would have known that Grubbs' constitutional rights were being violated. Therefore, there is sufficient evidence on the record for a fact finder to conclude that Everleth had a reasonable opportunity to intervene to stop the use of excessive force, but failed to do so. See Miranda Ortiz v. Cornacchia, No. 88 CIV. 5988 (CHT), 1990 WL 103982, at *4 (S.D.N.Y. Jul 16, 1990) (finding a genuine issue of material fact as to whether officers failed to intercede despite being aware of "the developing unlawful situation.").

Accordingly, it is recommended that defendants' motion on this ground be denied.


### ii. Application of the Jeffreys Exception

Defendants urge the Court to apply the Jeffreys exception in this case. In Jeffreys v. City of New York, the Second Circuit held that the plaintiff's uncorroborated version of events was so improbable that "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [the] complaint." Jeffreys v. City of New York, 426 F.3d 549, 555 (2d Cir. 2005). "The Jeffreys exception applies when 1) the plaintiff relies 'almost exclusively on his own testimony,'; 2) the plaintiff's testimony is 'contradictory or incomplete'; and 3) the plaintiff's testimony is contradicted by the evidence produced by the defense." Morris v. Plummer, No. 9:09-CV-0734 (NAM/DEP), 2011 WL 1135936, at *9 (N.D.N.Y. Mar. 2, 2011) (citation omitted).

Here, defendants base their Jeffreys exception argument largely on the fact that Grubbs' only evidence of excessive force is his own testimony without any corroborating

evidence.  Dkt. No. 54-1 at 15-16.  Indeed, Grubbs does not offer any corroborating

evidence, other than relying on the medical evidence submitted by defendants.  Grubbs

alleges in his complaint that he was pulled out of a line of inmates by Serrell for no reason,

shoved against the wall, handcuffed, and then beaten.  Am. Compl. at 3-5.  During Grubbs'

deposition testimony, he recounted the events of February 1, 2012 consistently with the

allegations in his complaint.  He stated that he was stopped by Serrell, who poked him in

the chest and asked him "[w]ho do you think you are?"  Lisi-Murray Decl. Exh. B (Dkt. Nos.

54-3; 54-4) (Deposition Testimony of Plaintiff) at 15:13-15.[3]  Grubbs asked Serrell not to

touch him, and Serrell told him that he could do whatever he wanted "just like [Grubbs] can

do whatever [he] want[s] to do."  Am. Compl. at 4; Lisi-Murray Decl. Exh. B at 15:16-18.

Grubbs then responded by telling Serrell that "[t]hat's exactly what [he] plan[ned] to do."

Am. Compl. at 4; Lisi-Murray Decl. Exh. B at 15:22-23.  Grubbs' response angered Serrell,

and Serrell shoved Grubbs against the wall, where Grubbs assumed the pat-frisk position.

Am. Compl. at 4; Lisi-Murray Decl. Exh. B at 16:23-25.  Serrell "violently" kicked Grubbs'

legs apart, and Everleth pulled Grubbs' right hand behind his back, allowing Serrell to

handcuff him.  Am. Compl. at 4; Lisi-Murray Decl. Exh. B at 17:3-9.  After Serrell handcuffed

Grubbs, he threw him to the ground and began to strike him repeatedly in the stomach.

Am. Compl. at 4-5; Lisi-Murray Decl. Exh. B at 17:8-11.  Grubbs cannot recall how long the

assault took place, but it ended when an unidentified individual pulled Serrell off of him.

Am. Compl. at 5; Lisi-Murray Decl. Exh. B at 17:19-20, 25; 18:2-3.  He was immediately

---

[3]  Citations to the deposition testimony refer to the CM/ECF generated page number of the
deposition, located at the top right corner of the pages, and the line number of that page.  See Dkt Nos. 54-3;
54-4.

taken for medical treatment.  Am. Compl. at 5.  During Lehmann's examination of Grubbs, pictures were taken that may appear to show Grubbs with a lump on his forehead.  <u>See</u> Lisi-Murray Decl. Exh. C at 4.  Grubbs states that he still suffers from "cluster headaches" and has permanent damage in his right eye, forehead, and left arm due to the assault, along with anxiety.  Am. Compl. at 29.

Defendants Serrell and Everleth argue a different version of events.  Serrell states that, on February 1, 2012, he observed an inmate handing an unidentified item to Grubbs.  Serrell Decl. ¶ 5.  Upon observing the exchange, Serrell ordered Grubbs to assume the pat-frisk position.  <u>Id.</u> ¶ 6.  At that time, Grubbs said to Serrell: "if you touch me I'm going to touch you."  <u>Id.</u>  Grubbs then abruptly turned to his right side and attempted to strike Serrell using his right elbow.  <u>Id.</u> ¶ 7.  Using both arms, Serrell grabbed Grubbs around his torso and forced him to the floor.  <u>Id.</u> ¶ 8.  Once Serrell restrained Grubbs, who was laying on his stomach, Serrell pulled his wrists behind his back and Everleth placed mechanical retraints on him.  <u>Id.</u> ¶¶ 9-11.  Everleth had just arrived at the scene in response to reports of a level two incident in the rotunda, which she observed to be Serrell's attempt to restrain Grubbs.  Declaration of Marci Everleth ("Everleth Decl.") ¶¶ 4-6.

The Court finds that application of the <u>Jeffreys</u> exception is inappropriate here.  As to the first prong of the <u>Jeffrey</u> exception, Grubbs relies almost exclusively on his own testimony, except for his reference to the pictures taken of him immediately after the alleged assault, which appear to show swelling on his forehead.  <u>See</u> <u>generally</u> Am. Compl.; <u>see</u> Dkt. No. 66-2 at 9-10.  Thus, this factor indicates that the <u>Jeffreys</u> exception is applicable.

However, as to the second prong establishing a <u>Jeffreys</u> exception, the Court finds that Grubbs' allegations are not contradictory or incomplete.  In <u>Jeffreys</u>, the plaintiff

equivocated as to whether he jumped out of a window, or whether police officers threw him out of the window. Jeffreys, 426 F.3d at 552. Additionally, the plaintiff in Jeffreys could not identify the police officers who allegedly assaulted him. Id. In contrast, the record before this Court contains no contradictory or incomplete statements from Grubbs. Grubbs states that Serrell engaged Grubbs in a hostile conversation, shoved him against a wall, restrained him, and then assaulted him. See Am. Compl. at 4-5. Notably, this version of events did not change during Grubbs' deposition. Although Grubbs admitted that his response to Serrell "was probably inappropriate," he did not deviate from the version of events set out in his complaint. See Lisi-Murray Decl. Exh. B at 15:16-21. Further, unlike the plaintiff in Jeffreys, Grubbs identifies the officers involved in the assault as Serrell and Everleth.

The last inquiry as to whether the Jeffreys exception applies is whether the plaintiff's version of events is contradicted by the defendants' version. Here, Grubbs' version of events differs from Serrell and Everleth's version in only some respects. For example, both parties disagree as to the conversation that took place before the alleged assault. Grubbs states that Serrell poked him in the chest, then Grubbs asked Serrell not to touch him. Am. Compl. at 4. Grubbs alleges that Serrell then told Grubbs that he could do whatever he wanted to do, just like Grubbs could do whatever he wanted to do. Id. Grubbs then responded by saying: "that's what I plan to do." Id. To the contrary, Serrell states that, after Grubbs assumed the pat-frisk position, Grubbs said: "if you touch me I'm going to touch you." Serrell Decl. ¶ 6. Then, Grubbs abruptly removed his hands from the wall and attempted to hit Serrell. Id. ¶ 7. Also, Grubbs claims that mechanical restraints were applied to him before Serrell forced him to the ground, while Serrell claims that the mechanical restraints were applied only after Serrell had restrained Grubbs on the ground.

<u>See</u> Am. Compl. at 4-5; Serrell Decl. ¶ 11.  However, many other portions of the parties'

accounts are similar.  Both parties agree that Grubbs was told to assume the pat-frisk

position, and both parties agree that Grubbs ultimately ended up on the ground, in

mechanical restraints.  <u>See</u> Am. Compl. at 5; Serrell Decl. ¶¶ 8-11.  For these reasons, the

Court finds that the third prong of the <u>Jeffreys</u> exception is inapplicable here.

Accordingly, the Court recommends that defendants' request to apply the <u>Jeffreys</u>

exception to Grubbs' February 1, 2012 excessive force claim be denied.


### b.  January 22, 2013 Excessive Force Incident

Grubbs alleges that defendants Raimo and Harrington[4] used excessive force against

him on January 22, 2013.  Am. Compl. at 15-16.  Defendant Raimo asserts that, on January

22, 2013, Harrington, Sergeant Williams, and he helped Grubbs stand and escorted him to

the medical department, as Grubbs claimed that he was suffering from an anxiety attack.

Declaration of Eugene Raimo ("Raimo Decl.") ¶¶ 7-8.  Defendants argue that the use of

force applied on January 22, 2013 was, at most, <u>de minimus</u> in nature.  Dkt. No. 54-1 at 13-

14.

As an initial matter, Grubbs does not claim that he sustained any injuries from the

January 22, 2013 incident.  The objective element of Grubbs' claim can therefore only be

satisfied if he shows that the force used by Raimo and Harrington was more than a <u>de</u>

<u>minimus</u> use of force.  <u>Jean-Laurent v. Wilkinson</u>, 540 F. Supp. 2d 501, 509 (S.D.N.Y.

---

[4]  Grubbs named Correction Officer Joseph Harrington as a defendant in this action.  Defendants allege that Harrington was not personally involved in the alleged constitutional violation because he was out on worker's compensation on the date of the incident in question.  This argument is addressed in section II.E.2, <u>infra</u>.

2008) (finding that the plaintiff need not show serious or significant injury provided that the amount of force used was more than de minimus). Grubbs claims that he suffered "a severe panic attack," blacked out, and awoke as he was being "dragged down the stairs." Am. Compl. at 15-16. After being "dragged" down two flights of stairs, Grubbs alleges that he was "thrown on top of the inmate clerk's desk." Id. at 16.

The Court finds that Grubbs has raised a genuine issue of fact as to the objective element of this excessive force claim. Raimo alleges that he did escort Grubbs from his cell to the medical department, but that he did not use excessive force in doing so. Raimo Decl. ¶¶ 7-12. It is well settled that "[t]he de minimus exception is sensitive to the context in which the force was used." Bridgewater v. Taylor, 698 F. Supp. 2d 351, 360 (S.D.N.Y. 2010) (citation omitted). Here, Grubbs was suffering from a mental health issue. His allegation that Raimo and Harrington dragged him down the stairs and threw him on top of the desk, if true, violates contemporary standards of decency, and therefore satisfies the objective element of Grubbs' claim. See Atkins v. Cnty. of Orange, 372 F. Supp. 2d 377, 401 (S.D.N.Y. 2005) (denying summary judgment where correction officers slammed the plaintiff's head and body against the wall during transport to the Mental Health Unit following the plaintiff's suicide attempt). Defendants acknowledge that Grubbs was suffering from a panic attack, therefore it appears that there was no perceived threat from Grubbs that would warrant the application of such force. Indeed, Grubbs indicates in his complaint that he was unable to walk, as he states that he was "hyperventilating with [his] head between [his] legs." Am. Compl. at 15. Therefore, the use of force was more than de minimus in nature.

As to the subjective element of Grubbs' excessive force claim, the Court notes that Raimo has not alleged a justification for his action, he has simply denied that Grubbs was

dragged down the stairs and thrown on top of a desk.  See Raimo Decl ¶¶ 7-8.  This indicates that a genuine issue of material fact exists as to whether Raimo acted maliciously and sadistically.  See Jones v. Reid, No. 85 CIV. 4515 (PKL), 1989 WL 83562, at *6 (S.D.N.Y. July 20, 1989) (denying summary judgment on excessive force claim where the plaintiff and the defendant stated different versions of whether the defendant slammed the plaintiff's arm in a door maliciously and sadistically).  The Court finds that, given the difference in events alleged by Grubbs and Raimo, there is a genuine issue of material fact as to Grubbs' excessive force claim.  Ali v. Szabo, 81 F. Supp. 2d 447, 459-60 (S.D.N.Y. 2000) (denying summary judgment where correction officers did not submit a justification for their use of force on the plaintiff).

Defendants again urge the Court to apply the Jeffreys exception to dismiss Grubbs' excessive force claim.[5]  However, the Jeffreys exception is also inapplicable to this incident.  Although Grubbs exclusively relies on his own testimony, he has not offered contradictory or incomplete statements in regard to the events that took place on January 22, 2013.  Furthermore, Grubbs' and Raimo's version of events only differ as to how Grubbs was taken down the stairs and escorted to the Mental Health Unit.  Grubbs alleges that he was dragged down the stairs and thrown on top of a desk.  Am. Compl. at 15-16.  Raimo alleges that Grubbs "was helped to his feet and escorted to the medical department."  Raimo Decl. ¶ 7.  For the reasons stated above, the Court finds that application of the Jeffreys exception is inapplicable to this claim.

Accordingly, it is recommended that defendants' motion on this ground be denied.

---

[5]  For an explanation of the applicability of the Jeffreys exception, see section II.B.2.a.ii, supra.

### C.  Interference with Legal Mail and Denial of Access to the Courts

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution."  Davis v. Goord, 320 F.3d 346, 351 (2d Cir.2003).  In order to state a claim for denial of access to the courts, including those premised on interference with legal mail, a plaintiff must allege that the defendant caused'actual injury, i.e. "took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'"  Id. (quoting Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir.1997) (additional citation omitted).  Such injury must affect "a nonfrivolous legal claim [which] had been frustrated or was being impeded due to the actions of prison officials."  Warburton v. Underwood, 2 F. Supp. 2d 306, 312 (W.D.N.Y.1998) (citation and internal quotation marks omitted); Shine v. Hofman, 548 F. Supp. 2d 112, 117-18 (D. Vt. 2008) (explaining that actual injury "is not satisfied by just any type of frustrated legal claim, because the Constitution guarantees only the tools that inmates need in order to attack their sentences . . . and . . . challenge the conditions of their confinement.") (internal quotation marks and citations omitted).

### 1.  McCauley

Grubbs alleges that, on January 24, 2013, he asked McCauley, who was the "steady Law Library officer," to use the photocopying machine in the law library. Am. Compl. at 18. McCauley informed him that the photocopying machine was out of order.  Id.  After Grubbs told McCauley that he had to mail legal papers to the Court of Claims by February 1, 2013, McCauley told him that if the photocopying machine was not fixed by January 28, 2013, McCauley would ensure that he could use the photocopying machine located in the school's

office, and that the mail would be sent in time for Grubbs to meet his deadline.  Id.  When

Grubbs went to the law library on January 28, 2013, and presented his approved advance

to McCauley, McCauley would not let him use the school's photocopy machine because he

needed verbal confirmation of the approved advance from the Acting Deputy

Superintendent of Programs, Ms. Tynon.  Id. at 19.  While Grubbs was waiting for Ms.

Tynon to return McCauley's telephone call, defendant Williams asked to interview Grubbs.

Id.  Grubbs was unable to make photocopies, and sent his original copies to the Court of

Claims.  Id.

McCauley alleges that he has no recollection of Grubbs requesting photocopies of

legal papers in January 2013.  Declaration of Robert McCauley ("McCauley Decl.") ¶ 12.

Additionally, the Business Office at Great Meadow does not have a copy of a disbursement

form or an Authorized Advanced Request submitted by Grubbs, which are required in order

for any inmate to obtain photocopies.  Id. ¶¶ 9-10, 15.  McCauley additionally states that he

has never purposely interfered with Grubbs' efforts to make photocopies or send legal mail.

Id. ¶ 16.

McCauley argues that the denial of access to the courts claim alleged against him by

Grubbs must be dismissed because, since Grubbs sent the original copies of his papers in

the absence of photocopies, Grubbs did not suffer an actual injury.  Dkt. No. 54-1 at 10-11.

Courts in this Circuit have routinely held that it is reasonable for a prison official to

require an inmate to produce the proper documentation that photocopies are required by

the courts before allowing the inmate to obtain free photocopies.  Collins v. Goord, 581 F.

Supp. 2d 563, 574 (S.D.N.Y. 2008).  Here, it is clear that Grubbs was attempting to obtain

free photocopies, as opposed to copies paid for from his inmate account, because he

alleges that he provided McCauley with an "approved advance," which allows inmates to obtain court-required photocopies when the inmate is lacking sufficient funds in his account. Am. Compl. at 19; McCauley Decl. ¶ 10. However, Grubbs has not produced a document stating that he had a valid Authorized Advance Request on any day in January 2013 or February 2013. Additionally, the Business Office at Great Meadow does not have a copy of an Authorized Advance Request. McCauley Decl. ¶ 15.

"[I]n order to succeed on a denial of access to the courts claim, plaintiff must demonstrate that the defendants' deliberate and malicious conduct resulted in actual injury." Muhammad v. Hodge, No. 07-CV-0232(Sr), 2010 WL 1186330, at *6 (W.D.N.Y. Mar. 24, 2010). Here, Grubbs only speculates that McCauley deliberately denied him access to the courts. Because Sergeant Williams, who Grubbs asserts a retaliation claim against, summoned Grubbs to his office while Grubbs was waiting for Ms. Tynon to return McCauley's call, Grubbs assumes that McCauley conspired with Williams to thwart Grubb's efforts to photocopy his documents. See Am. Compl. at 19-20. However, the record suggests that McCauley did not fulfill Grubbs' request for photocopies on January 28, 2013 because Grubbs did not have the requisite permission to obtain the photocopies. See McCauley Decl. ¶ 15; McCauley Decl. Exh. A at 8-9.

Additionally, and as argued by defendants, Grubbs admits that he sent his original papers to the Court of Claims, thereby negating the conclusion that he suffered an actual injury. "Where . . . it is alleged that access to materials needed for court matters has been denied, a plaintiff must allege that the denial proximately caused some 'actual injury,' i.e., some prejudice of denial of a legal claim." Ramsey v. Goord, 661 F. Supp. 2d 370, 401 (W.D.N.Y. 2009) (citing Lewis, 518 U.S. at 351). From this record, it is clear that any injury

suffered by Grubbs was caused by his own delay in requesting photocopies of documents only eight days before the Court of Claims deadline, in addition to his failure to obtain the required authorization for such photocopies. As such, the Court finds that no rational finder of fact could find in favor of Grubbs as to his denial of access to the courts claim against McCauley.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### 2. Serrell, Hood, Lawton, and Narkiewicz

Grubbs argues that Narkiewicz denied him access to the courts by not returning his mail to him in time for him to meet a court-imposed deadline in April 2012. Am. Compl. at 13-14. Narkiewicz alleges that Grubbs used $1.10 of his free legal mail postage on April 27, 2012. Declaration of Sarah Narkiewicz ("Narkiewicz Decl.") ¶ 8. The Great Meadow mailroom does not have a record of who that mail was addressed to. Id. On May 2, 2012, the mailroom received an envelope from Grubbs addressed to the New York Attorney General's Office. Id. ¶ 9. Attached to that mail was a signed disbursement form, dated May 1, 2012. Id. An officer signed the disbursement form on May 2, 2012, and the disbursement was approved by the Business Office on May 3, 2012. Id. The envelope was sent out on May 3, 2012. Id.

Additionally, Grubbs claims that, on January 29, 2013, he waited at his cell gate to hand his motion, addressed to the Court of Claims, to the company officers. Am. Compl. at 21. The gates to his cell door did not open, but Grubbs observed Serrell and an unidentified officer walking the hall. Id. at 21-22. Grubbs handed Serrell and the unidentified officer his outgoing mail, and asked them to sign the disbursement form. Id. at

22.  Neither officer responded.  Id.  Grubbs later discovered that the officers assigned to escort Grubbs' company to breakfast on January 29, 2013 were defendants Hood and Lawton.  Id.  Grubbs alleges that these officers were responsible for collecting mail, signing disbursements, and ensuring that the mail is processed.  Id.  On April 9, 2013, following an inquiry from Grubbs, the Court of Claims stated that it had no pending claims or motions filed under Grubbs' name.  Id. at 23.

On January 30, 2013, Grubbs handed his mail addressed to the New York Attorney General's Office, along with a disbursement form and letter to the Great Meadow mailroom to Serrell.  Am. Compl. at 22.  Grubbs also requested that Serrell sign the disbursement form.  Id. at 22-23.  Grubbs later discovered that the Attorney General's office received his letter and motion on February 11, 2013.  Id. at 23.

Narkiewicz outlined the documents that the Great Meadow mailroom has on file regarding Grubbs' outgoing mail in January and February 2013.  See Narkiewicz Decl.  As an Office Assistant, part of Narkiewicz's duties is ensuring that all inmates' outgoing mail complies with DOCCS directives.  Narkiewicz. Decl. ¶ 6.  On January 29, 2013, the Great Meadow mailroom received from Grubbs a legal envelope with a disbursement form and letter attached, dated January 29, 2013.  Id. ¶ 10.  The envelope was addressed to the New York Attorney General's Office.  Id.  Inmate accounts denied the postage on the envelope on February 1, 2013, because there was no signature on the disbursement form, which was required for outgoing legal mail.  Id. ¶ 11.  Narkiewicz sent the disbursement form back to Grubbs, requesting a signature.  Id.  She did not send the legal envelope back to Grubbs because she assumed that Grubbs would return the signed disbursement form within a few days.  Id.  After the mailroom did not receive the signed disbursement form from Grubbs,

his mail was sent to the New York Attorney General's Office on February 8, 2013 via facility postage, instead of postage paid from his Inmate Account.  Id.  The mailroom does not have a record of receiving legal mail from Grubbs addressed to the Court of Claims during the months of January and February 2013.  Id. ¶ 12.

"[D]istrict courts have generally required specific allegations of invidious intent or actual harm where [] incidents of tampering are few[.]".  Davis, 230 F.3d at 351.  Here, Grubbs alleges that he suffered actual harm because defendants Serrell, Hood, Lawton, and Narkiewicz sabotaged his efforts to file a late notice of intent, and later, a motion to file a late claim with the Court of Claims.  Defendants argue that Grubbs' default was his own fault.  Initially, Grubbs admits that, because he wrote the incorrect address on the disbursement form, he "defaulted" in serving a notice of intention on the Attorney General's Office in April 2012.  Am. Compl. at 13.  Grubbs then waited until seven days prior to his deadline to send papers to the Court of Claims requesting leave to file a late notice of claim.  Id. at 18-19.

Although Grubbs alleged that he was prejudiced because he missed the deadline to file a late notice of intent, he has not shown that Serrell, Hood, Lawton, or Narkiewicz acted willfully or maliciously to deny him access to the courts.  See Angulo v. Nassau Cnty., 89 F. Supp. 3d 541, 554 (E.D.N.Y. 2015) (granting summary judgment where the plaintiff failed to set forth evidence of mail tampering other than "mere suppositions about defendants' intent and the fact that the mail was not delivered.").  Rather, the defendants have produced evidence showing that Grubbs' own failure to timely send his legal mail was the reason for his failure to timely serve a notice of intent in April 2012, and a motion to file a late notice of intent in January 2013.  Therefore, the Court finds that Grubbs has failed to raise a genuine

issue of material fact as to his First Amendment denial of access to the courts claims.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### D.  First Amendment Retaliation

Grubbs claims that defendant Williams sent him to keeplock for three days because Williams refused to sign off on a grievance regarding the alleged destruction of Grubbs' personal property on January 22, 2013.  Am Compl. at 19-20.  Williams claims that Grubbs was placed on keeplock status because Grubbs expressed that he was having problems with other inmates, but refused to name the inmates.  Declaration of Toby Williams ("Williams Decl.") ¶ 15.  Grubbs was released from keeplock status three days later, after Williams' investigated Grubbs' claim and found that he was not in any danger.  Id. ¶ 16.

Courts are to "approach  [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]'"  See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506 (2002)).  A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); South Cherry St., LLC v. Hennessee Group LLC, 573 F.3d 98, 110 (2d Cir. 2009).  "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'"  Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by

Swierkiewicz, 534 U.S. 506 (2002)).  If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct."  Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).  "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives."  See Barclay v. New York, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007).  In order to prove an adverse action, a plaintiff must show that the defendant's "'retaliatory conduct . . . would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights . . . . Otherwise, the retaliatory act is simply de minimis, and therefore outside the ambit of constitutional protection.'"  Roseboro v. Gillespie, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (quoting Dawes, 239 F.3d at 292-93).

Grubbs has shown that he engaged in constitutionally protected conduct insofar as he claims to have filed a grievance against Williams.  See Graham v. Henderson, 89 F.3d 75, 80 (1996).  Additionally, Grubbs suffered an adverse action when he was placed in keeplock for three days, as courts in this district have previously held that keeplock confinement constitutes adverse action for purposes of a First Amendment retaliation claim. See Lashley v. Wakefield, 367 F. Supp. 2d 461, 467 (W.D.N.Y. 2005) (collecting cases).

However, Grubbs has failed to raise a genuine issue of material fact as to whether Williams placed him in keeplock in retaliation for his filing grievances.  A causal connection can be shown by, among other things, temporal proximity between the protected conduct and the adverse action.  Here, Grubbs filed a grievance against Williams and others on

January 24, 2013.  Williams Decl. Exh. A (Dkt. No. 54-14) at 8.  Williams then placed

Grubbs on keeplock status on January 28, 2013.  Am. Compl. at 20.  Additionally, Grubbs

alleges that Williams stated that he was going to send Grubbs "back to his enemies," who

Grubbs assumes are the same correction officers involved in the January 22, 2013 incident

that resulted in the grievance filed against Williams.  Id.  However, temporal proximity alone

"is insufficient to prove retaliatory animus."  Washington v. Donahue, 146 F. Supp. 3d 503,

506 (W.D.N.Y. 2015).  Although Grubbs alleges that Williams stated that he was returning

Grubbs to his "enemies," such a statement, in conjunction with temporal proximity, is

insufficient to raise an issue of fact because Williams has set forth a legitimate, non-

retaliatory reason for placing Williams in keeplock for three days.  Williams states that he

placed Grubbs on keeplock for three days while he investigated Grubbs' allegations that he

was in danger from other inmates.  Williams Decl. ¶¶ 15-16.  After the investigation was

concluded on January 30, 2013, Grubbs was released from keeplock.  Id. ¶ 16.  Notably,

Grubbs does not address this information in his response to defendants' motion.  Therefore,

the Court finds that defendants have met their burden in demonstrating a legitimate, non-

retaliatory reason for Grubbs three-day keeplock confinement.  See Hynes v. Squillace, 143

F.3d 653, 657 (2d Cir. 1998) (granting summary judgment where defendants showed a

legitimate non-retaliatory reason for taking adverse action, and the plaintiff acknowledged

that reason).

Accordingly, it is recommended that defendants' motion on this ground be granted.


### E.  Personal Involvement

It is unclear from Grubbs' complaint what claims he asserts against Racette.

Construing the complaint liberally, the Court finds that Grubbs asserts an Eight Amendment deliberate indifference to a serious medical need claim against Racette.  Grubbs alleges that Racette, in response to a letter from Legal Aid, stated that Grubbs was "thoroughly examined" following the alleged assault on February 1, 2012, and that Grubbs suffered from "self-induced anxiety."  Am. Compl. at 9-10.  Defendants allege that Grubbs has failed to establish Racette' personal involvement in the alleged constitutional violations.  Dkt. No. 54-1 at 17-18.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) (additional citations omitted)).  Thus, supervisory officials may not be held liable merely because they held a position of authority.  Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

> (1) the defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Wright v. Smith, 21 F.3d 496, 501

(2d Cir. 1994) (additional citation omitted)).[6]  Assertions of personal involvement that are

merely speculative are insufficient to establish a triable issue of fact.  See e.g., Brown v.

Artus, 647 F. Supp. 2d 190, 200 (N.D.N.Y. 2009).


### 1.  Racette

Grubbs alleges in his complaint that Racette received a letter from the Legal Aid

Society regarding Grubbs' medical treatment.  Am. Compl. at 10.  Racette states that he

"forwarded [the letter] to the medical unit for an investigation and subsequent reply."

Declaration of Steven Racette ("Racette Decl.") ¶ 16.  After receiving information from the

medical staff, Racette wrote a response letter to the Legal Aid Society.  Id.  As a non-

medical official at Great Meadow, Racette acted appropriately in deferring to medical staff in

order to respond to the Legal Aid Society.  See Sharma v. D'Silva, No. 14-cv-6146 (NSR),

2016 WL 319863, at *6-7 (S.D.N.Y. Jan. 25, 2016) (finding no personal involvement where

prison superintendent deferred to the opinion of a medical professional in responding to the

plaintiff's complaints).  Therefore, Grubbs has failed to establish that Racette was

personally involved in any constitutional violation.

Furthermore, even if the Court were to find that Grubbs established Racette's

personal involvement, it is well-established that non-medical professionals may rely on the

---

[6]  Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision has affected the five Colon factors which were traditionally used to determine personal involvement.  Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175, 185 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

opinion of medical professionals regarding the treatment of inmates' medical conditions. See Joyner v. Greiner, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002). For the reasons stated in section II.B.i supra, Grubbs has failed to show that Racette was deliberately indifferent to his serious medical need.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### 2. Harrington

Defendant Joseph Harrington was identified by Grubbs as a participant in the alleged excessive force incident that took place on January 22, 2013. Am. Compl. at 15-16. Harrington states that he was out of work on Workers' Compensation from January 16, 2013 through January 23, 2013, and therefore was not present when the incident occurred. Declaration of Joseph Harrington ("Harrington Decl.") ¶ 6. Grubbs does not dispute this contention. Therefore, the Court finds that Grubbs has failed to establish Harrington's personal involvement in the alleged constitutional violation. See Harris v. Skinner, No. 99-CV-6393 CJS, 2003 WL 22384794, at *5 (W.D.N.Y. Sept. 4, 2003) (granting summary judgment to certain defendants who were not present for the alleged constitutional violation).

Accordingly, it is recommended that defendants' motion on this ground be granted.

### III. Conclusion

For the reasons stated above, it is hereby:

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 54) be

      **GRANTED** as to plaintiff Bobby Grubbs' (1) Eighth Amendment deliberate

indifference claims against Racette, Lehmann, Lipka, and Karandy; (2) Eighth

Amendment excessive force claim against Harrington; (3) First and Fourteenth

Amendment denial of access to the courts claims against McCauley,

Narkiewicz, Serrell, Hood, and Lawton; (4) First Amendment retaliation claim

against Williams; and

     **DENIED** as to the Eighth Amendment excessive force claims against Serrell,

Everleth, and Raimo; and it is further

     **RECOMMENDED** that defendants Racette, Lehmann, Lipka, Karandy, Harrington,

McCauley, Narkiewicz, Hood, Lawton, and Williams be **DISMISSED** from this action;

and it is further

     **ORDERED** that the Clerk serve a copy of this Report-Recommendation and Order on

the parties in accordance with Local Rules.

     Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the

foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO**

**OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE**

**APPELLATE REVIEW**.  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y

of HHS, 892 F.2d 15 (2d Cir. 1989); see also 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a),

6(e).


DATED:    August 18, 2016
            Albany, New York

                            *Christian F. Hummel*
                        Christian F. Hummel
                        U.S. Magistrate Judge